HARRIET M. EATON, APPELLANT, V. ELI EATON, APPELLEE.

FILED DECEMBER 17, 1902.   No. 11,850.

1. Valid Marriage: CONSENT OF STATE: POSITIVE PROHIBITION: EVIDENCE OF CONSENT. There can be no valid marriage without the consent of the state, and a positive prohibition does not evidence consent.

2. Divorce Law: POLICY: BIGAMY: RELEASE FROM WEDLOCK. It is not the policy of the divorce law to encourage bigamy. Therefore a person who has been released from wedlock by judicial decision is not permitted to indulge the hope that if he marry again in violation of the statute, the marriage will be valid unless the decision is reversed.

3. Statute: PREVENTIVE: REPRESSIVE. Section 45, chapter 25, Compiled Statutes, 1901,* is preventive, and not merely repressive. It incapacitates a divorced person from contracting a valid marriage while the judgment divorcing him is subject to possible reversal.

4. Marriage: CONSENT: COHABITATION. In this state the only essential of a valid marriage is the free consent of competent parties to live together in the marriage relation.

5. ———: REMOVAL OF IMPEDIMENT: CONTINUOUS COHABITATION. Where a marriage contracted in good faith is void by reason of some removable impediment, the parties may, after the impediment has been removed, become lawfully united by con-

---

* Cobbey's Annotated Statutes, sec. 5369.

tinuing to live together with the intention of sustaining toward each other the relation of husband and wife. And even where the existence of the impediment and its removal were unknown, continued cohabitation evidences consent to live in wedlock.

6. **Changes in Statutes: NEW LAW: CONSTITUTION.** Changes or modifications of existing statutes as an incidental result of adopting a new law covering the entire subject to which it relates, are not forbidden by section 11, article 3, of the constitution.

APPEAL from the district court for Cass county. Bill for divorce by Harriett M. Eaton against Eli Eaton. Heard below before JESSEN, J. Decree for defendant. Plaintiff appeals. *Reversed.*

*D. O. Dwyer,* for appellant.

*William Hayward, contra:*

In Tennessee, under a statute which prevented a defendant in a divorce suit, who had been guilty of adultery, from marrying his or her *particeps criminis* during the life of the first spouse, the second wife was barred from homestead. *Owen v. Bracket,* 7 Lea, 448.

*A. J. Beeson* and *Samuel M. Chapman,* also for appellee.

SULLIVAN, C. J.

On the 5th day of March, 1900, Harriet M. Eaton filed her amended petition in the district court for Cass county against Eli Eaton; alleging her marriage to him on March 21, 1899; alleging various acts of extreme cruelty on the part of the defendant toward her; the failure of her health in consequence thereof, and her enforced abandonment of her home; that she was without means of support; that defendant was possessed of valuable property, describing it; and concluding with a prayer for maintenance and support. The defendant answered, admitting the marriage as alleged by plaintiff, and denying generally all the other allegations of the petition, and in addition pleaded,

by way of cross-bill, two causes of action: (1) That the
marriage between himself and the plaintiff·was brought
about through the solicitation of the plaintiff, who made
various false representations regarding herself, upon the
faith of which he married her; that she was guilty of
many acts of cruelty, more or less specifically set out;
and (2) it was alleged that plaintiff had imposed upon
the defendant in inducing him to marry her when by an
act of the legislature (section 45, chapter 25, Compiled
Statutes*) she was under a disability, having obtained a
decree of divorce from a former husband, Enis Goff, on
the 2d day of December, 1898, in Johnson county, Ne-
braska. Defendant also alleged that he was illiterate, and
knew nothing of the act of the legislature referred to at
the time of his marriage; that plaintiff represented herself
as having been for a long time divorced from her former
husband, and that she was capable of entering into a valid
contract of marriage with defendant; that he first learned
of the time when said divorce was obtained on March 9,
1900, and that plaintiff's marriage with the defendant
was in violation of law, and therefore void. The cross-
bill concluded with a prayer for divorce, and for general
relief, but subsequently, by leave of court, the prayer was
amended. It now asks "that the said unlawful marriage
between this defendant and said plaintiff be decreed to be
a nullity, and that should said court find said marriage
lawful and valid, that said defendant be granted a di-
vorce." Plaintiff denied generally the allegations of the
cross-bill, and pleaded that defendant had full knowledge
of the divorce proceedings in Johnson county; that plaintiff
knew nothing of the statute prohibiting remarriage until
the filing of defendant's cross-bill; that such act was un-
constitutional and void; that her marriage with defend-
ant was in good faith, and that for a number of months
after the expiration of six months from the decree of
divorce, plaintiff and defendant continued to live and co-
habit together as husband and wife, and thereby the mar-

* Cobbey's Annotated Statutes, sec. 5369.

riage contract was ratified; that defendant, having had full knowledge of the divorce proceedings in Johnson county, was estopped from alleging such matters as ground for a divorce from plaintiff; that the district court of Johnson county had jurisdiction to grant and did grant a divorce to plaintiff, without any limitations or conditions. A trial was had, which resulted in a finding that there was no equity in plaintiff's petition, and a finding against defendant on his first cause of action. Upon defendant's second cause of action the court found that the parties were married March 21, 1899; that plaintiff, Harriet M. Eaton, obtained a decree of divorce from Enis Goff in Johnson county, December 2, 1898; that said decree of divorce was obtained without the knowledge of Eli Eaton; that the parties to this suit lived together until November 30, 1899; that the decree of divorce from Enis Goff, the former husband of plaintiff, was obtained less than six months prior to the marriage of plaintiff and defendant; that such marriage was in violation of law and a nullity; and that defendant had no knowledge of the time when the prior divorce was procured until just prior to the commencement of this action. The marriage between plaintiff and defendant was adjudged to be null and void, and was set aside and defendant released from all marital obligations on account of such marriage. To secure a reversal of this decree the case has been brought to this court by appeal.

The evidence taken at the trial not having been preserved, the only question presented by the record is whether, upon the pleadings and findings of fact, the decision in favor of defendant is right.

The force and effect of the marriage ceremony performed March 21, 1899, has been much discussed by counsel and will be first considered. Sections 1 and 2 of chapter 49, Session Laws of 1885, are as follows:

"Section 1. It shall be unlawful for any person who shall obtain a decree of divorce to marry again during the time allowed by law for commencing proceedings in error

or by appeal for the reversal of such decree, and in case such proceedings shall·be instituted it shall be unlawful for the defendant in error or appellee to marry again during the pendency of such proceedings, and a violation of this act shall subject the party violating it to all the penalties of other cases of bigamy.

"Sec. 2. No.proceedings for reversing, vacating, or modifying any decree of divorce, except in so far as such proceedings shall affect only questions of alimony, property rights, custody of children, and other matters not affecting the marital relations of the parties shall be commenced, unless within six months after the rendition of such decree, or in case the person entitled to such proceedings is an infant, a person of unsound mind, within six months, exclusive of the time of such disability."

The first section of this act, which is section 45 of the divorce law, has the effect, we think, of disqualifying a divorced person from marrying while the decree of divorce is ′subject to possible reversal. The will of the lawgiver is the law; and the avowed object of the legislature, as expressed in the title of the act of 1885, was "to prevent the marriage of divorced persons during the time allowed· for proceedings to reverse the decree of divorce, and during the pendency of such proceeding." As there can be no valid marriage without the consent of the state, the easy and obvious way for the state to prevent objectionable marriages is to withhold its consent. By the legislation we are considering the state has said to divorced persons, "Thou shalt not," and in this we are unable to discover any implication·of consent. The legislature aimed at prevention. We know this because it has said so. But it is contended that while aiming at prevention it fell short of its object and achieved only repression, and that the law, instead of putting an end to an obnoxious practice, acts as a mere deterrent—a check and curb on the matrimonial impulse. Public policy no doubt favors the marriage contract, but it will not do to distort a plain statute in order to bring it into harmony with what the court may

conceive to be sound policy. The legislature determines the policy of the state, and it having declared in express terms that it intended by the act of 1885 to stop an evil practice, the courts are not warranted in holding that the object of the law was, after all, not to stop the practice, but only to discourage it. The legislative intent is no less clearly expressed in the body of the act than in the title. "A violation of this act," it is declared, "shall subject the party violating it to all the penalties of other cases of bigamy." The use of the word "other" in this clause is significant; it plainly implies that notwithstanding the divorce the former relation is regarded as still continuing. It implies that a divorced person, until his status becomes unalterably fixed, is to be considered and dealt with as though the decree of divorce had not been rendered. The statute, as we interpret it, is in harmony with the trend of modern legislation, and promotive of social order and sound morality. It is important—it is, indeed, of the highest importance—that the civil and social condition of every person be at all times fixed and certain. There should be no needless uncertainty about the status of any individual. Whether a person is capable or incapable of contracting a valid marriage should be clearly understood, and should not be made to depend upon a judicial decision to be rendered at some indefinite time in the future. The validity of a divorce depends ultimately, at the option of the defeated party, upon the decision of this court. Before the case is appealed and while it is pending here, it is uncertain whether the parties are single or married. This being so, it would be manifestly unwise, when prevention is so easy, to permit a second marriage to be contracted during the time the case is appealable or while the appeal is pending. The intention of the legislature, as evidenced by the act of 1885, is not, we think, in doubt, but if it were we should, for the peace of society, and on considerations of morality and convenience, resolve the doubt against the capacity of a divorced person to marry during the proscribed period.

The great importance of having the social status of every person fixed and certain at all times has induced some courts (*Lucas v. Lucas,* 69 Mass., 136; *Bascom v. Bascom,* 7 Ohio, 465; *Sheafe v. Sheafe,* 29 N. H., 269) to hold that decrees of divorce are not reviewable. Others, for the same reason, have held by strained constructions that a statute providing for the opening of judgments rendered upon constructive service has no application to actions for divorce. *O'Connell v. O'Connell,* 10 Nebr., 390; *Lewis v. Lewis,* 15 Kan., 181; *McJunkin v. McJunkin,* 3 Ind., 30; *Gilruth v. Gilruth,* 20 Ia., 225. In Missouri there is an express statute providing that decrees of divorce shall not be subject to review. *Richardson v. Stowe,* 102 Mo., 33. Some states have statutes which declare that a divorced person shall be incapable of contracting marriage for a specified time, or while the case is appealable and during the pendency of the appeal. Marriages contracted in violation of these statutes have been uniformly held to be null and void. *Smith v. Fife,* 17 L. R. A. [Wash:], 573; *McLennan v. McLennan,* 38 L. R. A. [Ore.], 863; *Wilhite v. Wilhite,* 41 Kan., 154.

With respect to statutes which evidence the legislative intent only by a prohibition and a penalty, it may be said that two antithetical views find support in the adjudged cases. The supreme court of Mississippi recently reviewed these cases, and, while holding that a marriage contracted in violation of law is not void, felt constrained to admit that the weight of judicial authority was opposed to its conclusion. *Crawford v. State,* 35 L. R. A. [Miss.], 224. In reading the Mississippi case and other cases holding that the state impliedly consents to a marriage which it has forbidden, one can not escape the conclusion that the hardship of the particular case exerted an undue influence on the decision, and that the hardships resulting from reversed sentences of divorce were altogether overlooked. It may seem harsh and cruel to render a decision which will involve an innocent person in guilt and bastardize after-begotten children, but these consequences are

inevitable; they result from either interpretation of the law. A divorced person about to marry again should rot be without positive knowledge of the legal consequence of his act. He should be given to understand that he is under absolute, and not under possible or probable, disability, and that any marriage which he may contract will be certainly null. He should not be encouraged to commit bigamy by being permitted to marry in the belief that the new union will be valid unless the decree by which he was divorced shall be reviewed and reversed. If we were to hold that marriages contracted in violation of the statute are valid, the decision would, in our judgment, be a powerful incentive to crime. Such marriages would be multiplied, and the evils resulting from reversed divorces would be incalculable. We have no disposition to construe the legislative interdict as sovereign acquiescence in disguise, for, it seems to us, such a construction would be grounded neither on sound reason nor enlightened sentiment.

Another question to be determined is the legal effect of the cohabitation of the parties after the impediment to their marriage had been removed. In this state the only thing essential to a marriage is the consent of parties capable of contracting. *Bailey v. State,* 36 Nebr., 808; *Gibson v. Gibson,* 24 Nebr., 394. Even a license is not indispensable. *Haggin v. Haggin,* 35 Nebr., 375. If the parties live together and intend to sustain toward each other the relation of husband and wife, they are, in the absence of any impediment fatal to that relationship, legally married. The marriage between the plaintiff and defendant was an attempt made in good faith to form a legal union. Both intended to live in wedlock. In the absence of an impediment to the marriage, no ceremony would have been required; the mutual consent of the parties would have been sufficient. When the impediment was removed, why may not consent be inferred from continued cohabitation? This exact question arose in the House of Lords in the case of *De Thoren v. Attorney General,* reported in 1 App. Cas., 686, decided in 1876.

The question turned upon the legitimacy of certain children born to a man and woman who were married in Scotland, going through a public ceremony in a church, believing the marriage a valid one. The man, however, had been divorced, and the time for appeal from the decree at nisi prius had not expired at the time of the public marriage. In that case the contention was that the inference of marriage was rebutted, because the parties had commenced living together in pursuance of an invalid marriage, and that the consent deducible from cohabitation must be referred to the ineffectual ceremony. But it was there decided that "it must be inferred that the matrimonial consent was interchanged as soon as the parties were enabled, by the removal of the impediment, to enter into the contract"; and further: "The ceremony which took place, although invalid, was undoubtedly a consent by the parties to live together as husband and wife. And their subsequent cohabitation was proof of continued consent." In the case cited, Lord Chelmsford said: "Taking the facts as they are stated in the case, and applying the law to them, the court of session is of opinion that, assuming the ignorance of the parties of the invalidity of the ceremony of marriage during the whole period of their cohabitation, yet after the removal of the impediment to their marriage and before the birth of their eldest son, they became married persons. I agree entirely with this opinion." In *Rose v. Clark,* 8 Pai. Ch. [N. Y.], *574, Chancellor Walworth says: "It appears, however, from decisions in our own courts, as well as in England, that a subsequent marriage may be inferred from acts of recognition, continued matrimonial cohabitation and general reputation, even where the parties originally came together under a void contract of marriage." *Fenton v. Reed,* 4 Johns. [N. Y.], *52; *Blanchard v. Lambert,* 43 Ia., 228. In the recent case of *University of Michigan v. McGuckin,* 62 Nebr., 489, it was held, although the relations of the parties were originally meretricious, that marriage is a social status, the existence of which may be shown by

conduct clearly indicating free consent and mutual intention to live in wedlock. Upon the conceded facts in this case, our conclusion is that the parties, by continuing to live together in the matrimonial relation, contracted a valid marriage.

The contention that section 45 of the divorce law is violative of the constitution, is overruled on the authority of *De France v. Harmer, ante,* p. 14.

The judgment is reversed and the cause remanded for further proceedings.

REVERSED AND REMANDED.

